UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

INTERNATIONAL LONGSHORE AND
WAREHOUSE UNION, LOCAL 40,

                    Plaintiff,

            v.

COLUMBIA GRAIN, aka
WILLAMETTE STEVEDORING,

                    Defendants.

_____

Case No. 3:13-CV-00513-AC

FINDINGS AND
RECOMMENDATION

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff International Longshore and Warehouse Union, Local 40 ("Local 40"), filed this

action against defendant Columbia Grain ("Columbia") under the Labor Management Relations Act,

29 U.S.C. § 185(a) ("LMRA"). Local 40 seeks to compel Columbia, as an alter ego of Willamette

Stevedoring ("Willamette"), to arbitrate a contractual grievance arising out of a collective bargaining

agreement ("CBA") entered into between Local 40 and Willamette (the "Agreement"). Columbia

FINDINGS AND RECOMMENDATION  1                                    *{BJT}*

maintains it is not a party to the Agreement and that Local 40 has failed to sufficiently allege Columbia, as the parent corporation, is obligated under the Agreement signed by its subsidiary, Willamette.

Columbia moves for judgment on the pleadings pursuant to Rule 12(c) or, in the alternative, for summary judgment pursuant to Rule 56. The court finds it must not consider Columbia's judgment on the pleadings motion, because Columbia's entire motion must be treated as one for summary judgment under Rule 56. Accordingly, the court finds genuine issues remain for trial and the motion should be denied.

*Preliminary Procedural Matter*

While Local 40 does not object to the deposition transcript pages offered by Columbia, the court notes that they do not include signed reporters' certificates and are, therefore not properly authenticated. Evidence presented in support of or in opposition to a motion for summary judgment must be based on personal knowledge, properly authenticated, and admissible under the Federal Rules of Evidence. FED. R. CIV. P. 56(e). "The requirement of authentication * * * as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EVID. 901(a) (2013). Evidence that is not properly authenticated will not be considered by the court when reviewing a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). The Ninth Circuit stated in *Orr* that:

> A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent. See Fed. R. Evid. 901(b); Fed. R. Civ. P. 56(e) & 30(f)(1). Ordinarily, this would be accomplished by attaching the cover page of the deposition and the reporter's certification to every deposition extract submitted. It is insufficient for a party to submit, without more, an affidavit from her counsel identifying the names of the deponent, the reporter, and the action and stating that the depositions is a "true

> and correct copy." Such an affidavit lacks foundation even if the affiant-counsel
> were present at the deposition.

*Orr*, 285 F.3d at 774 (footnote and case citations omitted). Local 40, however, has offered and

properly authenticated a number of excerpts from the depositions of the same individuals, thereby

providing the basis for their admissibility. In *Orr*, the Ninth Circuit held that:

> when a document has been authenticated by a party, the requirement of authenticity
> is satisfied as to that document with regards to all parties, subject to the right of any
> party to present evidence to the ultimate fact-finder disputing its authenticity.

*Orr*, 285 F.3d at 776. The deposition excerpts offered by Columbia are consistent, both in content

and appearance, with the properly authenticated excerpts offered by Local 40. Consequently, the

court will consider Columbia's deposition transcripts in this Findings and Recommendation.

### Background

Willamette was created in 2005 to provide a means for Columbia to obtain Pacific Maritime

Association ("PMA") and International Longshore and Warehouse Union ("ILWU") shipside labor

and to provide Columbia control over stevedoring services. (Def.'s Reply Mem. in Supp. of Mot.

for J. on the Pleadings or Summ. J. ("Def.'s Reply") Ex. A at 18:3-25.) Willamette is a subsidiary

of Columbia. (Def.'s Reply Ex. A at 50:3-13.) Columbia contracted with Willamette for shipside

work until December 27, 2012. (Def.'s Mem. in Supp. of Mot. for J. on the Pleadings or Summ. J.

("Def.'s Mem.") Att. 2 at 2; Def.'s Reply Ex. B at 8:8-19.) At times, Willamette contracted with

other customers as well. (Def.'s Reply Ex. A at 21:22-25; Ex. B at 8.) Willamette employed

Supercargo Clerks ("Supercargoes") from Local 40 to perform certain functions prior to December

27, 2012. (Def.'s Reply Ex. B at 4:21-5:2.) The employment of Willamette's Supercargoes was

governed by the Agreement. (Def.'s Mem. Att. 2 at 3.)

Tom Hammond served as the President of both Columbia and Willamette. (Def.'s Reply Ex. B at 6:21-7:1.) All of the managers of Columbia and Willamette were on Columbia's payroll. (Spisak Dep. 19:11-19, April 10, 2014.) Each company had its own "general manager" who saw to each separate companies' day-to-day operations – for Willamette, it was Mike Morgan; for Columbia, it was Randy Cartmill. (Def.'s Reply Ex. A at 7:21-24, 11:14-16, 47:2-9; Cartmill Dep.12:13-25, April 10, 2014; Donahue Dep. 16:1-25, 17:1-5, April 10, 2014.) Willamette's offices were located inside of Columbia's Port of Portland Terminal No. 5 ("Terminal 5") office. (Morgan Dep. 9:5-12.)

Columbia was never a member of the PMA. (Cartmill Decl. ¶ 11.) Columbia was, however, a party to a separate, multi-employer CBA (the "Grain Handlers Agreement") with ILWU Locals 4, 8, 19, and 23. (Def.'s Mem. Att. 2 at 4; Cartmill Decl. ¶ 8.) The Grain Handlers Agreement governed the terms and conditions of employment for dockside or grain elevator work at Columbia's Terminal 5 facility and expired on or about September 30, 2012. (Def.'s Mem. Att. 2 at 4.) Negotiations on a successor agreement to the Grain Handlers Agreement reached an impasse, and Columbia implemented aspects of its Last, Best and Final Offer, including a Shipside Addendum. (Def.'s Mem. Exs. B, C; Cartmill Decl. ¶ 29.)

The Shipside Addendum was a part of a Columbia bargaining objective to "level [the] playing field with its competitors." (Cartmill Decl. ¶ 24.) Columbia saw the playing field as uneven because its competitors had labor agreements that: (a) allowed elevator operators to perform shipside work themselves; (b) eliminated the necessity of employing Supercargoes and entering into contracts with PMA stevedoring companies; and (c) reduced other manning requirements for shipside work. (Cartmill Decl. ¶ 25.)

FINDINGS AND RECOMMENDATION  4                                    *{BJT}*

Under the terms of the Shipside Addendum, effective December 27, 2012, Columbia employees, represented by ILWU Locals 8 and ILWU Local 92, began performing certain shipside functions formerly performed by Local 40-represented employees of Willamette, to the extent those functions were still being performed.  (Def.'s Mem. Att. 2 at 5; Cartmill Decl. ¶¶ 27-29.)  Columbia notified Willamette that its services were no longer needed at Columbia's Terminal 5 facility effective December 27, 2012.  (Def.'s Mem. Ex. A at 3.)  Willamette ceased all operations and no longer employed any employees as of December 27, 2012.  (Def.'s Reply Ex. A at 7:5-10.)  Upon Willamette's cessation of operations, the two full-time employees of Willamette, Morgan and ship superintendent Christopher Donahue, simply remained on the payroll of Columbia and their job duties did not change.  (Spisak Dep. 19:11-19; Donahue Dep. 12:5-10, 20:7-14.)  At the time of its cessation, Willamette's only customer was Columbia Grain.  (Morgan Dep. 36:7-15.)

On or about January 21, 2013, Local 40 filed the Grievance alleging a lost work claim.  (Def.'s Mem. Ex. E.)  On February 7, 2013, Columbia informed Local 40 it would not process the Grievance because it had no obligation to honor the Agreement.  (Def.'s Mem. Ex. E.)

Columbia operated under the terms of the Last, Best and Final Offer, including the Shipside Addendum until May 4, 2013.  (Def.'s Mem. Ex. D.)  On May 4, 2013, Columbia locked out Local 8 bargaining unit employees in support of its Last, Best and Final Offer, for the stated purpose to end a significant competitive disadvantage created by an agreement that ILWU had reached involving a Port of Kalama export elevator which included reduced staffing levels.  (Def.'s Mem. Ex. D at 1.)  Further, Columbia locked out Local 8-represented employees to combat slowdowns and other tactics being used by those employees at Columbia's Terminal 5 facility.  (Def.'s Mem. Ex. D at 1.)

*Procedural Background*

On May 30, 2013, Columbia moved to dismiss Local 40's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. This court found Local 40 failed to adequately allege Columbia is an alter ego of Willamette, Columbia had breached the Agreement, and Columbia should be compelled to arbitrate the dispute. Thus, Columbia's motion to dismiss was granted without prejudice. Local 40's request for leave to re-plead was also granted and Local 40 then filed an amended complaint.

Columbia now moves to dismiss the Amended Complaint with prejudice, requesting judgment on the pleadings or, in the alternative, summary judgment. Columbia again asserts it is not a party to the Agreement executed by its subsidiary and the Amended Complaint fails to "state a plausible basis for compelling a non-party to submit to arbitration, to which it never consented." (Def.'s Mem. at 1.) Columbia argues Local 40 must plead fraud with particularity, and the Amended Complaint "fails to allege any basis or factual support showing a fraudulent or sham change in corporate structure, anti-union animus, fraudulent statements or concealments of material facts, or any other fraudulent or sham undertakings." (Def.'s Mem. at 2.) In the alternative, Columbia argues the material facts are not be genuinely disputed and show that Local 40 cannot establish that Columbia has engaged in fraud or a sham transaction. (Def.'s Mem. at 13.)

*Legal Standards*

I.  Motion for Judgment on the Pleadings

A motion for judgment on the pleadings is governed by Rule 12(c), which states, "[a]fter the pleadings are closed - but early enough not to delay the trial - a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c) (2013). The purpose of a Rule 12(c) motion is to challenge the

sufficiency of the opposing party's pleadings, and the court applies the same standard as a motion under Rule 12(b)(6). *Chavez v. United States*, 683 F.3d 1102, 1108-09 (9th Cir. 2012). Accordingly, judgment on the pleadings is appropriate when, even if all material facts in the pleading under attack are true, the moving party is entitled to judgment as a matter of law. *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989). Although the court must assume as true all facts asserted in the pleading, it need not accept as true any legal conclusions set forth in the pleading. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (refining the approach, created in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), to determine sufficiency of pleadings under Rule 8 and related motions for dismissal). If matters outside the pleadings are considered, the motion shall be treated as one for summary judgment. FED. R. CIV. P. 12(d) (2013).

## II.  Motion for Summary Judgment

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2013). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV. P. 56(c) (2013). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

I.  Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(d) provides, in pertinent part:

If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

FED. R. CIV. P. 12(d) (2013). *See Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 921-22 (9th Cir. 2004) (applying this approach in reviewing the district court's reliance on materials outside the

pleadings and treatment of motions to dismiss for failure to state a claim under FRCP 12(b) as motions for summary judgment pursuant to FRCP 56).  *See also Silk v. Metro. Life Ins. Co.*, 477 F. Supp. 2d 1088, 1091 (C.D. Cal. 2007) *aff'd*, 310 F. App'x 138 (9th Cir. 2009) ("Where a defendant attaches extrinsic evidence to a motion for judgment on the pleadings, the court generally must convert that motion into one for summary judgment.")  Here, the two parties presented attached declarations, deposition excerpts, and other extrinsic evidence outside the pleadings, the court is not excluding that evidence and is relying on it, and the parties were "fairly apprised" the court would look beyond the pleadings.  Accordingly, Columbia's motion for judgment on the pleadings must be converted to a motion for summary judgment.

The Ninth Circuit does not require strict adherence to formal notice requirements, instead examining the record in each case "to determine whether the party against whom summary judgment was entered was 'fairly apprised that the court would look beyond the pleadings and thereby transform the 12(b) motion to dismiss into one for summary judgment.' "  *Garaux v. Pulley*, 739 F.2d 437, 439 (9th Cir. 1984) (quoting *Mayer v. Wedgewood Neighborhood Coalition*, 707 F.2d 1020, 1021 (9th Cir. 1983)).   In the Ninth Circuit, notice occurs when a party has reason to know the court will consider matters outside the pleadings.  *See Townsend v. Columbia Operations*, 667 F.2d 844, 849 (9th Cir. 1982).  Further, "[a] represented party who submits matters outside the pleadings to the judge and invites consideration of them has notice that the judge may use them to decide a motion originally noted as a motion to dismiss, requiring its transformation to a motion for summary judgment."  *Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1533 (9th Cir. 1985).

When the Ninth Circuit applies the preceding legal standards in situations where a motion to dismiss is accompanied by extrinsic evidence, the court simply bypasses the motion to dismiss analysis altogether:

> The pleadings in this case were accompanied by affidavits. We will therefore treat the motion to dismiss as one for summary judgment, and determine whether there is any genuine issue of material fact and whether the government is entitled to judgment as a matter of law. . .

*Fort Vancouver Plywood Co. v. United States*, 747 F.2d 547, 552 (9th Cir. 1984) (discussing a 12(b)(6) motion and ultimately finding summary judgment inappropriate.)

The Ninth Circuit has recognized ". . . a motion to dismiss is not automatically converted into a motion for summary judgment whenever matters outside the pleading happen to be filed with the court and not expressly rejected by the court." *N. Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 582 (9th Cir. 1983). However, the instances in which such conversion does not occur are those where "nothing in the [court] record suggest[s] reliance on the [extrinsic evidence]" and a "district court. . . expressly indicate[s] that it [is] dismissing [on motion to dismiss grounds]." *Id.* (citing *Lodge 1380, Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Employees (BRAC) v. Dennis*, 625 F.2d 819, 824-825 (9th Cir. 1980)). Given that the court has discretion to look to the extrinsic evidence in deciding Columbia's motion, and because the court believes a motion for summary judgment most appropriately and efficiently resolves the issues brought forward by Columbia, the court here relies on the extrinsic evidence presented by Columbia and Local 40.

Columbia, with its initial motion for judgment on the pleadings, or in the alternative for summary judgment, included evidence beyond the pleadings as attachments and argued that this evidence was either "incorporated [into Local 40's amended complaint] by reference" or capable of being judicially noticed. (Def.'s Mem. at 7.) While this contention may have had merit in

preventing that initial offering of extrinsic evidence from triggering a required conversion to a summary judgment determination, the court need not weigh its validity.  In later court filings (Local 40's memorandum in opposition and Columbia's reply memorandum) both parties submitted "matters outside the pleadings" to the court which could not be appropriately incorporated by reference or judicially noticed, and they "invite[d] consideration of them."  The extrinsic "matters" presented by Local 40 included evidence such as deposition transcript excerpts and correspondence between Columbia employees.  The extrinsic "matters" presented by Columbia included evidence such as a declaration from Cartmill, correspondence between Columbia and Local 40, the Shipside Addendum, and correspondence between Columbia and other ILWU officials.  The court is not excluding and is relying on that evidence.  Further, the "represented part[ies]" had notice that the court may use the evidence they "submit[ted]" to the court and "invite[d]" the court to look at.  *See Grove*, 753 F.2d at 1533.

For these reasons, the court will not consider Columbia's judgment on the pleadings motion because Columbia's entire motion must be treated as one for summary judgment under Rule 56.

II.  Summary Judgment

Columbia moved, in the alternative, for summary judgment.  As explained above, the court must treat the entire motion as one for summary judgment.  On the merits, Columbia's motion for summary judgment should be denied because reasonable minds could differ as to the conclusions to be drawn from the facts and genuine issues of material fact remain for trial.

A.  *"Single Employer"*

Because the undisputed evidentiary facts related to the single-employer prong support contradictory inferences and reasonable minds could differ as to the conclusions to be drawn from

those facts, summary judgment is inappropriate.  In its initial memorandum, Columbia argued the single employer section of the Amended Complaint is conclusory.  (Def.'s Mem. at 12.)  Local 40 went beyond the pleadings and identified facts pertinent to the four single-employer inquiry factors to show a genuine issue for trial.  While Columbia does not dispute these identified facts, Columbia and Local 40 dispute the inferences the court should draw from them in making a summary judgment determination.

"Even when the evidentiary facts are undisputed, summary judgment should not be granted where contradictory inferences may be drawn from those facts."  *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936, United Bhd. of Carpenters & Joiners of Am.*, 680 F.2d 594, 598 (9th Cir. 1982) (citing to *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *United States v. Perry*, 431 F.2d 1020, 1022 (9th Cir. 1970)).  *See also Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985); *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006). Further:

> The decision faced by the court [in a summary judgment determination] is . . . whether the evidence on the motion. . . presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. . .  If reasonable minds could differ as to the conclusions drawn from the evidence in the record, the motion for summary judgment should be denied.

*1000 Friends of Oregon v. U.S. Forest Serv.*, 804 F. Supp. 104, 108-09 (D. Or. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986)).

Ninth Circuit case law further supports the notion that summary judgment is inappropriate where the single-employer factored analysis is necessary to establish that two entities constitute a single employer and the nonmoving party has identified facts which create genuine dispute of fact

on the four factors.  After recognizing that single-employer status under the LMRA "ultimately depends on all the circumstances of the case" in applying the four factors, the court stated:

> How well the Union's evidence matches up against the contrary evidence presented by Ward and ADS we cannot say, for we cannot weigh evidence on this record; but we conclude the Union's evidence was sufficient to raise the genuine question whether Ward and ADS truly were 'separate employers' dealing with each other at arm's length.

*Int'l Bhd.*, 50 F.3d at 776 (9th Cir. 1995) (applying "single employer" factors under LMRA and the Worker Adjustment and Retraining Notification Act concurrently in reviewing a grant of summary judgment *de novo*.)  *See Anderson*, 477 U.S. at 249 (". . .[I]t is clear enough from our recent cases that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.")

In *Nor-Cal*, the Ninth Circuit found ample evidence suggesting the two companies constituted a single employer.  *Nor-Cal*, 48 F.3d at 1471 (finding a genuine issue of material fact as to the second prong of the alter ego analysis and reversing a summary judgment ruling in favor of the union).  The court recognized as evidence of the first two factors, common ownership and common management, testimony of the owner and manager which established himself as the owner, licenses which established him as a managing officer, and testimony by others suggesting he exercised day-to-day control over company operations.  *Id.* at 1472.  As evidence of the third factor, interrelation of operations, the court recognized that one company established its accounts on the strength of the other company's credit, served briefly as its purchasing agent, the two companies exchanged materials and supplies, and they commingled their finances.  *Id.*  Finally, as evidence of the most important factor, centralized control of labor relations, testimony suggested the owner and

manager did the hiring, training, supervising and firing of employees and were highly involved in both companies' day-to-day labor relations.  *Id.* at 1471.

1.  "Centralized Control of Labor Relations"

The most important factor in determining whether or not Columbia and Willamette constitute a single employer – centralized control of labor relations – favors Columbia.  Unlike in *Nor-Cal*, the evidence establishes separate labor relations functions.  Mike Morgan, the general manager of Willamette, handled the majority, if not all, of the labor relations pertaining to Willamette's side of the business.  (Morgan Dep. 8:3-14.)  Morgan's supervisor, Tom Hammond, the president of both Columbia and Willamette, had no real involvement in those relations and was largely uninvolved in the day-to-day operations of Willamette in that respect.  (Morgan Dep. 14:8-12, 15:3-8, April 10, 2014; Donahue Dep. 15:13-16.)

2.  "Common Management"

The evidence further supports an inference of a lack of common management between the two companies' day-to-day operations.  Despite the fact that all managers were on Columbia's payroll, each company had its own "general manager" who saw to each company's day-to-day operations – for Willamette, it was Morgan; for Columbia, it was Cartmill.  (Spisak Dep. 19:11-19; Cartmill Dep. 7:21-24, 11:14-16, 12:13-25, 47:2-9; Donahue Dep. 16:1-25, 17:1-5.)

3.  "Interrelation of Operations"

Local 40 has presented evidence that creates an inference of interrelation of operations.  *See Tanaka*, 675 F.2d at 1033.  In *Nor-Cal*, the Ninth Circuit examined evidence related to one company's financial needs being assuaged by the other, a common financial relationship between

the two, and shared operational aspects, with respect to the interrelation of operations factor.  *Nor-Cal*, 48 F.3d at 1472.

The evidence here shows Columbia "needed" a PMA stevedoring company to execute its contracts.  (Cartmill Decl. ¶ 12; Cartmill Dep. 50:20-25, 54:9-14.)  After contracting with outside stevedoring companies prior to 2005, Columbia decided to bring stevedoring services "in-house".  (Cartmill Decl. ¶ 13; Cartmill Dep. 50:3-14.)   Many of the services formerly performed by Willamette for Columbia are still necessary to Columbia's operations, and are currently performed by Columbia employees and those from another ILWU local.  (Cartmill Decl. ¶ 33; Morgan Dep. 41:10-15.)  The key difference is more recent CBAs have eliminated the requirement of contracting with PMA-member stevedoring companies.  (Cartmill Decl. ¶ 19.)

The fact that Willamette was housed inside Columbia's Terminal 5 is additional evidence supporting an inference of interrelation of operations between Columbia and Willamette.   In *Nor-Cal*, the companies exchanged materials and supplies; here Columbia and Willamette shared space and worked in the same area.  *Nor-Cal*, 48 F.3d at 1471.  (Morgan Dep. 9:5-12.)

4.  "Common Ownership and Financial Control"

Finally, the evidence offered by the parties when viewed in a light most favorable to Local 40 creates a genuine issue of material fact of common ownership and financial control between Columbia and Willamette.  In his deposition, Cartmill confirms Columbia decided it needed more control over stevedoring and that Columbia "brought [stevedoring services] in-house" with the creation of Willamette:

Q. Okay let me ask you this: Willamette Stevedoring is owned by Columbia Grain, right?  Was?

A.  I honestly don't know what the structure was, but. . .

Q.  But you knew they were basically a subsidiary?

A.  Yes. * * *  We'd gone through many stevedores and ultimately came to the decision that we needed to have more control over who that stevedore was. . .

Q.  So rather than dealing with third parties - -

A.  Correct.

Q.  - - you brought it in-house?

A.  Yes.

(Cartmill Dep. 49:15-25, 50:3-6.)  Further, Morgan both confirmed that Columbia owned Willamette and that Willamette's profits ultimately benefitted Columbia.

Q.  So, I assume you were turning a profit?

A.  We - - we did okay.

Q.  And that profit would then be sent to - - You were owned by Columbia Grain, right?

A.  That is correct.

(Morgan Dep. 11:20-24)

Viewing the undisputed evidence pertaining to the single-employer inquiry in a light most favorable to Local 40, the court finds there is sufficient evidence upon which a fact-finder could return a verdict for Local 40.  *Anderson*, 477 U.S. at 249.  Thus, summary judgment would be inappropriate.

B.  *"Sham Transaction"*

1.  "A Genuine Dispute of Material Fact"

A genuine dispute of material fact exists for trial on the sham transaction prong regarding Columbia's "chief purpose" in ceasing Willamette's operations.  Columbia contends Willamette

ceased operating due to a lack of business, however, Local 40 presented evidence that Willamette ceased operating as a means of decreasing the amount of union labor costs involved in its shipside operations.  (*See* Def.'s Memo at 15; Def.'s Reply at 14-15; Pl.'s Mem. at 11-13.)

The alter ego doctrine focuses on whether there is an attempt to avoid the obligations of a CBA through a sham transaction or a technical change in operations.  The Ninth Circuit has held that a defendant seeking to avoid the high cost of union labor is sufficient to establish such an attempt.  *See Haley*, 880 F.2d at 1152.  *See also Tanaka*, 675 F.2d at 1035.  In *Haley*, the Ninth Circuit reviewed a National Labor Relations Board ("NLRB") decision which found that two companies were alter egos, and ordered a nonsignatory to honor a CBA.  *Haley*, 880 F.2d at 1149.  The nonsignatory party argued the transfer of equipment and employees at issue "was an economically motivated business decision akin to a plant relocation or closing. . ."  *Id.*  The court reiterated "the determination that one entity is merely another's alter ego will depend to some extent on whether or not the . . . dissolution of the old entity is motivated by union animus."  *Id.* at 1150 (quoting *Tanaka*, 675 F.2d 1029).  In analyzing the evidence relating to whether the transfer was motivated by union animus, the court looked to statements made by the signatory company's vice-president which established the "chief purpose for transferring [the] assets to [the other company] was to avoid the high cost of union labor."  *Id.* at 1152.  Further, the companies did not dispute the transfer took place, in part, to compete effectively against other companies.  *Id.*  Ultimately, the court found substantial evidence supported the NLRB's order and enforced the Board's decision.  *Id.*

Here, in the section of its initial memorandum listing "facts that are undisputed and/or beyond genuine dispute", Columbia included "Due to lack of business, Willamette Stevedoring ceased all operations and no longer employs any employees." (Def.'s Memo at 15.) Columbia later

identified evidence to support this assertion, that Willamette previously had customers other than

Columbia (Morgan Dep. 11:15-19.); in December 2012, Columbia was Willamette's only customer

(Morgan Dep. 36:9-11.); and, when Columbia notified Willamette it no longer needed its services

on December 27, 2012, Willamette lost its only customer.  (Morgan Dep. 36:9-15.)

    Local 40, in response, pointed to deposition testimony of Cartmill to support its assertion that

the evidence shows the transfer of work from Willamette was motivated by a desire to avoid the high

cost of excess union laborers:

    Q.   So, I'm sorry, the Kalama Export and EGT, those are different
    competitors?

    A.  Correct.

    Q. So you're saying that internally within Columbia Grain there was a desire
    to level the playing field, in other words, reduce costs, associated with grain handling
    and loading, and that you wanted to make a proposal that eliminated the use of
    Willamette Stevedoring for doing that work for Columbia Grain to avoid costs?

    A.  No.

    Q.  Okay.

    A.  We wanted to eliminate any stevedore from doing the job.

    Q.  And when you eliminate any stevedore from doing the job, why does that
    reduce costs?

    A.  There are multiple ways that would reduce costs.

    Q.  Okay.  Please describe them to me.

    A.  Up to and including the number of men that were involved in the process.

    Q.  Can you explain that a little bit more?  I'm not sure what you mean.

    A.   The PMA stevedores were required to follow what is called a grain
    manning agreement, and the manning levels for that, that are required under that

> agreement, were less favorable than what the union had granted EGT and Kalama. They had significantly less people involved in their operation.

(Cartmill Dep. 21:20-22:22.)  This testimony creates a genuine issue of fact whether Columbia transferred work from Willamette to avoid the cost of union labor.

For the foregoing reasons, viewing the evidence in a light most favorable to Local 40, there exists a genuine dispute of a material fact on the sham transaction prong of the alter ego claim, and summary judgment is inappropriate.

### 2.  Legitimate Business Decision

Columbia uses the same evidence to support its argument that its decision to cease its relationship with, and operation of, Willamette was a legitimate business decision.  (Def.'s Reply at 2; Cartmill Decl. ¶ 19-33.)

The court recognizes the Ninth Circuit's conclusion in *Nor-Cal* that evidence of "an alternate explanation of the reasons [behind the] . . . eventual demise of [the union company]" was sufficient to "create[] a genuine issue of material fact regarding whether [the owner] . . . operated [the alter ego] with the intention of avoiding [the union company]'s collective bargaining obligations." *Nor-Cal*, 48 F.3d at 1474 (reversing district court grant of summary judgment).  Even if no dispute as to the material fact discussed above exists, when viewed in a light most favorable to Local 40, the evidence provided could reasonably allow the finder of fact to render a verdict in Local 40's favor on the sham transaction prong. *Id.* 477 U.S. at 252.  Here again, contradictory inferences may be drawn from these arguably undisputed facts. *See Sherman Oaks*, 680 F.2d at 598.  Further, summary judgment is generally inappropriate in cases "where motive and intent play a leading role in a determination of liability, and where the proof is largely in the hands of the defendants." *Id.* (reviewing the district court's grant of summary judgment on a count involving an allegation that

FINDINGS AND RECOMMENDATION  19                                    *{BJT}*

unions engaged in unlawful common situs picketing with the intent to encourage the employees of neutral subcontractors to strike or refuse to work at a particular job site in order to force Sherman Oaks to cease doing business with a non-union subcontractor (citing *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473 (1962))).

The evidence, when viewed in a light favorable to Local 40, allows a reasonable inference that Columbia's  motivation in transferring the work and changing its operational structure was to keep pace with its competitors and that Columbia sought to accomplish this by cutting back on the amount of union employees involved in its shipside operations.  A transfer of work to intentionally avoid CBA obligations to employ a required amount of union employees, and, in effect, to cut costs to remain competitive, parallels *Haley* and *Tanaka*.   Thus, Columbia's alternative motion for summary judgment should be denied.

### Conclusion

Columbia's alternative motion for summary judgment (# 29) should be DENIED.

### Scheduling Order

The Findings and Recommendation will be referred to a district judge for review. Objections, if any, are due on **Tuesday, August 5, 2014**.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within **14 days** after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 21st day of July, 2014.

/s John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge