UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

INTERNATIONAL LONGSHORE AND
WAREHOUSE UNION, LOCAL 40,

                    Plaintiff,

              v.

COLUMBIA GRAIN, a.k.a. WILLAMETTE
STEVEDORING,

                    Defendant.
_____

Case No.: 3:13-cv-513-AC

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff International Longshore and Warehouse Union, Local 40 ("Local 40"), filed this

action against defendant Columbia Grain ("Columbia") under the Labor Management Relations Act,

29 U.S.C. § 185(a) (the "Act").  Local 40 seeks to compel Columbia, as an alter ego of now defunct

Willamette Stevedoring ("Willamette"),  to arbitrate lost-work grievances arising out of a collective

bargaining agreement.  Columbia contends neither Local 40 nor Columbia are parties to the agreement, Local 40 has no authority to compel arbitration of the lost-work grievances under the agreement, Local 40 failed to exhaust the grievance procedure, and Columbia is not liable for Willamette's obligations under a joint employer/alter ego theory.

A two-day court trial of Local 40's case against Columbia commenced on April 6, 2015.  On May 6, 2015, the court heard closing arguments and the parties' final submissions were filed June 3, 2015.   Thereafter, the court took this case under advisement.

After careful consideration of the facts and evidence presented by the parties at trial through live witnesses and exhibits, and having had the opportunity to assess the demeanor of the witnesses, and review and weigh the evidence, the court makes the following findings of fact, which the court finds and holds were established by a preponderance of the evidence, and conclusions of law, pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.[1]

*Findings of Fact*

I. Columbia

1.      From about 1978 until September 30, 2014, Columbia was in the business of merchandising, unloading, warehousing, and discharging grain into ocean-going vessels destined to various export markets at a facility located in the Rivergate Industrial area of the Port of Portland known as Terminal 5.  (Trial Tr. 41:8-10; 68:10-15; 73:6-13; 89:7-5; 287:6-7.)

2.      Columbia worked under the terms of a collective bargaining agreement known as the Grain Handlers Agreement entered into by the International Longshore and Warehouse Union (the

---

[1]To extent any finding of fact constitutes a conclusion of law, or any conclusion of the law constitutes a finding of fact, the courts adopts it as such.

"ILWU"), specified locals representing longshoremen from different geographical locations, and a group of grain elevator operators doing business in the Pacific Northwest (the "Grain Handlers Agreement"). (Trial Tr. 98:12-99:2; Ex. 105 at 1.)

3.     Columbia performed the unloading, warehousing, and control room work, or the elevator-side work, at Terminal 5 with its own labor force, which consisted primarily of longshoremen from Local 8 working under the Grain Handlers Agreement. (Trial Tr. 91:93:25; 95:5-13; 96:2-6; 97:4-8.)

4.     Columbia contracted with various stevedoring companies to perform the ship loading or ship-side work. (Trial Tr. 99:25-100:7;106:2-7.)

5.     Ship-side work at Terminal 5 consisted of three classifications of ILWU members:

(a) Longshoremen, dispatched by Local 8, who worked on the ship, opening and closing cargo hatches and aiming the gravitational flow of the grain from the loading spouts into the hulls of the ship, etc.;

(b) One foremen, or "walking boss", dispatched by Local 92, who oversaw the handling of cargo onboard a ship and supervised all of the longshoremen; and

(c) One supercargo/clerk, dispatched by Local 40, who was responsible for the safe and efficient loading of vessels and documentation, generally characterized as a "middleman". (Trial Tr. 41:1-2; 58:18-24; 102:3-104:9; 181:3-10; 204:6-18.)

II.  Willamette

6.     In 2005, Columbia, dissatisfied with the customer service it was receiving from the stevedoring companies it contracted with, created Willamette to provide more responsive stevedoring services, or ship-side work, to Columbia. (Trial Tr. 77:8-23; 105:13-15; 153:3-154:9; 171:11-25.)

7.     Willamette hired Mike Morgan as General Manager ("Morgan") and Chris Donahue as Shipping Superintendent ("Donahue").  (Trial Tr. 152:15-18; 178:1-6.)

8.     Morgan and Donahue were Willamette's only full-time employees.  (Trial Tr. 178:1-4.)

9.     Willamette became a member of the Pacific Maritime Association ("PMA") and was governed by various PMA and ILWU labor agreements, such as the Pacific Coast Longshore and Clerks' Agreement.  (Trial Tr. 100:8-17; 178:24-180:1; Ex. 127.)

10.    The PMA is a multi-employer association that negotiates and administers Pacific coast marine labor agreements on behalf of its members.  (Trial Tr. 178:25-179:15.)

11.    The ILWU is a diverse organization which represents and negotiates on behalf of all its workers, or members.  (Trial Tr. 208:23-209:6.)

12.    The Pacific Coast Longshore and Clerks' Agreement is not itself a stand-alone agreement but, rather, is bifurcated into two agreements, one being the Pacific Coast Longshore Contract Document (the "Black Book") and the other being the Pacific Coast Clerks' Contract Document (the "White Book").  (Trial Tr. 209:19-210:1; 243:12-19.)

13.    The White Book governs Local 40's supercargo/clerks.  (Trial Tr. 243:12-19.)

14.    While providing stevedoring services to Columbia, Willamette used supercargo/clerks from Local 40 as required under the White Book.  (Trial Tr. 40:15-17; 41:11-22; 58:14-16; 59:14-60:16.)

15.    Columbia has never been a member of the PMA and never been a party to the Pacific Coast Longshore and Clerks' Agreement or, more specifically, the White Book.  (Trial Tr. 100: 22-23; 120:13-15.)

III.  Columbia's Competitive Disadvantage

16.    In February 2012, EGT, a grain elevator operator in competition with Columbia, negotiated

a labor agreement with the ILWU incorporating a ship-side addendum allowing EGT to perform the ship-side work itself, thereby eliminating the need to contract with PMA-member stevedoring companies.  (Trial Tr. 109:3-6; 109:14-18.)

17.    The EGT labor agreement did not require the employment of supercargo/clerks, provided other reduced manning requirements for both the elevator-side and ship-side work, and allowed EGT to hire steady employees inside the elevator.  (Trial Tr. 109:14-23.)

18.    The EGT labor agreement was nearly identical to a labor agreement that another Columbia competitor, Kalama Export, had negotiated previously with the ILWU.  (Trial Tr. 109:14-15; 100:1-12.)

19.    Columbia, and other grain handlers, believed the favorable terms in the EGT and Kalama Export labor agreements put them at a competitive disadvantage and made it likely they would lose customers to EGT and Kalama Exports unless they were able to "level the playing field."  (Trial Tr. 109:7-12; 112:12-15.)

20.    Shortly after the execution of the EGT labor agreement, Dane Jones, Local 40's Secretary Treasurer/Business Agent ("Jones"), sent a letter to Robert McEllrath, ILWU International President ("McEllrath"), expressing concern that despite consistent requests by Local 40 to be included, supercargo/clerks were excluded from the EGT labor agreement, and seeking information on how supercargo/clerks would be represented by the ILWU in the future.  (Trial Tr. 225:1-227:22.)

IV.  Grain Handlers Agreement Negotiations

21.    The Grain Handlers Agreement in effect when the EGT labor agreement was negotiated covered a one-year term from October 1, 2011 through September 30, 2012 (the "2012 Grain Handlers Agreement").  (Ex 105.)

22.    The parties to the 2012 Grain Handlers Agreement were the ILWU, Local 4 (Vancouver), Local 8 (Portland), Local 19 (Seattle) and Local 23 (Tacoma), and the Individual Pacific Northwest Grain Elevator Operators, comprised of individual grain elevator operators, including Columbia (the "Elevator Operators").  (Ex 105.)

23.    The 2012 Grain Handlers Agreement was limited to a one-year term to allow the Elevator Operators, who were aware EGT was scheduled to become operational in 2012, the opportunity to see the terms of the EGT labor agreement before committing beyond 2012.  (Trial Tr. 108: 21-109:2.)

24.    In response to the perceived competitive disadvantage created by the EGT and Kalama Export labor agreements, the Elevator Operators developed a bargaining objective of achieving a level playing field with their competitors by trying to get essentially the same terms and conditions EGT and Kalama Export had been given.  (Trial Tr. 112:22 -113:13.)

25.    Specifically, the Elevator Operators desired a ship-side addendum allowing them to perform ship-side work themselves, thereby eliminating the need to contract with a stevedoring company (the "Ship-Side Addendum").  (Trial Tr. 143:22-23; 229:2-11.)

26.    Additionally, the Ship-Side Addendum did not require the use of supercargo/clerks.  (Trial Tr. 229:6-11.)

27.    When negotiations for a successor Grain Handlers Agreement began in August, 2012, the Elevator Operators proposed the inclusion of the Ship-Side Addendum.  (Trial Tr. 115: 3-6.)

28.    Randy Cartmill, General Manager of Columbia ("Cartmill"), served as Columbia's representative on the Elevator Operators' negotiating team, and in that capacity attended the numerous bargaining sessions and mediations, which occurred between August and December 27,

2012.  (Trial Tr. 68:9-19; 114: 9-13.)

29.     Although Local 40 was not an official party to the Grain Handlers Agreement(s), Jones attended some bargaining and/or small group sessions on behalf of marine clerks, offered his perception of the value of supercargoes, and helped formulate some of the ILWU's contract demands.  (Trial Tr. 217:7-20; 114:18-24; 115:25-116:4.)

30.     On November 16, 2012, the Elevator Operators made their Last, Best and Final Offer, which included the Ship-Side Addendum ("LBFO").  (Trial Tr. 117:3-10; Ex. 106.)

31.     The ILWU rejected the LBFO in December, 2012.  (Trial Tr. 117:11-17.)

32.     In light of the undeniable impasse, the Elevator Operators implemented portions of the LBFO, including the Ship-Side Addendum, effective December 27, 2012. (Trial Tr. 117:1-118:12; Ex. 106.)

V.  Effect of Ship-Side Addendum

33.     The Ship-Side Addendum authorized Columbia to hire longshoremen (dispatched by Local 8) and foremen (dispatched by Local 92) to perform ship-side work directly for Columbia.   (Trial Tr. 119:5-8; 191, lines 8-10.)

34.     The Ship-Side Addendum eliminated the need to hire supercargo/clerks (dispatched by Local 40).  (Trial Tr. 118:20-23; 220:5-9.)

35.     Accordingly, after December 26, 2012, Local 40 no longer received orders to dispatch supercargo/clerks to Terminal 5.  (Trial Tr. 220:16-25.)

36.     Additionally, Columbia, now able to perform ship-side work itself, notified Willamette its stevedoring services were no longer needed.  (Trial Tr. 189:15-20; Ex. 119.)

37.     Willamette, with no other customers, ceased operations on December 27, 2012, and

subsequently withdrew from the PMA.  (Trial Tr.  190:1-6; 254:22-24.)

VI.  The White Book

38.    In response to Columbia's performance of ship-side work at Terminal 5 without requesting supercargo/clerks, Local 40 initiated lost work opportunity claims pursuant to the grievance provisions of the White Book.  (Trial Tr. 220:16-221:4.)

39.    The White Book is a contract "by and between Pacific Maritime Association (hereinafter called the 'Association'), on behalf of its members (hereinafter designated as 'the Employers' or the 'individual employer'), and the International Longshore and Warehouse Union (hereinafter designated as the 'Union'), on behalf of itself and each and all of its clerks' locals in California, Oregon, and Washington (hereinafter designated as 'clerks' locals') and all employees performing work under the scope, terms and conditions of this Contract Document."  (Ex. 127 at 1.)

40.    The White Book specifically states "[t]he parties hereto are the International of the International Longshore and Warehouse Union and the coastwise Pacific Maritime Association." (Ex. 127 at 1.)

41.    The White Book further provides "[a]ll property rights in and to the Agreement, including this Contract Document for Clerks and Related Classifications, are entirely and exclusively vested in the Pacific Maritime Association and the International Longshore and Warehouse Union, respectively, and their respective members." (Ex. 127 at 1.)

42.    Section 17 of the White Book establishes the applicable grievance and arbitration procedures. (Ex. 127 at 58-76.)

43.    Section 17.11 requires the parties to establish and maintain a Joint Port Labor Relations Committee ("Committee") "comprised of 3 or more representatives designated by the ILWU and 3

or more representatives designated by the Employers." (Ex. 127 at 58.)

44.    The Committee has the duty to "investigate and adjudicate all grievances and disputes according to the procedure outlined in this Section 17."  (Ex. 127 at 59.)

45.    Grievances which do not arise on the job "shall be referred to the Joint Port Labor Relations Committee which shall have the power to investigate and adjudicate it."  (Ex. 127 at 61.)

46.    Section 17.15 of the White Book provides:

> The grievance procedure of this Agreement shall be the exclusive remedy with respect to any disputes arising between the Union or any person working under this Agreement or both, on the one hand, and the Association or any employer acting under this Agreement or both, on the other hand, and no other remedies shall be utilized by any person with respect to any dispute involving this Agreement until the grievance procedure has been exhausted.

(Ex. 127 at 60.)

47.    Section 17.24 provides that:

> In the event that the Employer and Union members of any Joint Port Labor Relations Committee shall fail to agree upon any question before it, such question shall be immediately referred at the request of either party to the Area Arbitrator for hearing and decision, and the decision of the Area Arbitrator shall be final and conclusive except as otherwise provided in Section 17.26.

(Ex. 127 at 61.)

48.    Section 17.281 provides that "[s]hould either party fail to participate in any of the steps of the grievance machinery, the matter shall automatically move to the next higher level."  (Ex. 127 at 63.)

49.    Section 17.282 provides "[i]f the local grievance machinery becomes stalled or fails to work, the matter in dispute can be referred at once by either the Union or the Association to the Joint Coast Labor Relations Committee for disposition." (Ex. 127 at 63.)

50.     Section 17.43 provides, in relevant part: "[a]n appeal from the decision of the Joint Coast Labor Relations Committee can be presented to the Coast Arbitrator (or by agreement of the Joint Coast Labor Relations Committee to an Area Arbitrator) by the individual involved, the Employers or the Union."  (Ex. 127 at 65.)

51.     McEllrath and Ray Ortiz, Jr., ILWU Coast Longshore Division Committeeman ("Ortiz"), executed the White Book for the ILWU "on behalf of itself and each and all of its longshore locals in California, Oregon, and Washington and all employees performing work under the scope, terms, and conditions of this Agreement."  (Trial Tr. 130:5-7; 192:3-7; 225:11-13; Ex. 127 at 99.)

VII.  Local 40's Lost Work Claims

52.     On December 27, 2012, Ortiz and Leal A. Sundet, another ILWU Coast Long Shore Division Committeeman ("Sundet"), forwarded a letter to Morgan, who was now operations manager for Columbia, inquiring about the relationship between Columbia and Willamette for the purpose of monitoring compliance with the White Book (the "ILWU Letter").  (Trial Tr. 190:15-18; Ex. 121)

53.     The ILWU's Coast Longshore Division represents both longshoremen and marine clerks. (Trial Tr. 209:10-11.)

54.     The Coast Long Shore Division Committee members, who are elected representatives of longshoreman and marine clerks and handle labor relations on a coast-wide basis for the ILWU's Coast Longshore Division, forwarded copies of the ILWU Letter to Locals 8, 40, and 92.  (Trial Tr. 209:10-11; 214:21-215:18; Ex. 121.)

55.     In a letter dated January 21, 2013, Jones complained to Cartmill that Columbia had performed work reserved to supercargo/clerks at Terminal Five on two vessels without hiring a supercargo/clerk in violation of the White Book, represented that Columbia and Willamette were a

single employer under the Act, and indicated an intent to file two lost-work opportunity claims for the work in question.  (Ex. 107.)

56.    Jacqueline Damm, Columbia's labor attorney ("Damm"), responded in a letter dated February 7, 2013, stating Columbia was not a single employer with Willamette for any purpose, was not a party to the Pacific Coast Longshore and Clerks Agreement or any agreement with Local 40, and would not participate in, or be bound, by any claim or grievance process under the Pacific Coast Longshore and Clerks Agreement.  (Ex. 108.)

57.    In a letter dated March 14, 2013, addressed to Cartmill, Jones submitted to Columbia additional lost-work claims relating to seven identified vessels.  (Ex. 109.)

58.    On March 27, 2013, Willamette's counsel, Michael Garone, responded to the ILWU letter indicating Morgan and Donahue were now employed by Columbia and no employees of Willamette were performing work or supervising work at or for Columbia, and refusing to explain, or provide documents clarifying, the relationship between Columbia and Willamette without proof of the necessity and relevance of such information.  (Ex. 122.)

59.    In a letter dated May 14, 2013, addressed to Cartmill,  Jones submitted to Columbia additional lost-work claims relating to five identified vessels.  (Ex. 1.)

60.    On May 23, 2013, Cartmill responded to Jones's submission of additional claims in March and May 2013, reiterating Damm's representation that Columbia is not a single employer with Willamette, is not a party to the Pacific Coast Longshore and Clerks Agreement or any agreement with Local 40, and will not process the claims forwarded to date, or any future claims filed, on behalf of Local 40.  (Ex. 112.)

61.    The lost-work grievances were also submitted to the Committee pursuant to Section 17.23

of the White Book. (Trial Tr. 253:7-10; 254:11-16.)

62.     The Committee met to discuss the lost-work grievances regularly from January 2013 to September 2013.  (Trial Tr. 255:9-256:7.)

63.     The Committee consistently agreed to hold the lost-work grievances in abeyance based on Willamette's withdrawal from the PMA and Columbia's refusal to participate in the grievance mechanism.  (Trial Tr. 254:20-24; 255:13-21; 256:8-10.)  The Committee advised Local 40 they would have to pursue the lost-work grievances if they intended to enforce the White Book.  (Trial Tr. 257:16-24.)

VIII. New Grainhandlers Agreement

64.     A new Grain Handlers Agreement was ratified and became effective on August 27, 2014. ("New Grain Handlers Agreement").  (Trial Tr. 125:15-24; 130:25-131:6.)

65.     The New Grain Handlers Agreement was entered into by the "International Longshore and Warehouse Union and Locals 4, 8, and 19 on behalf of themselves and each of their members. . . ." (Ex. 166 at 3.)

66.     The New Grain Handlers Agreement included terms substantially equivalent to those in place at EGT and Kalama Export.  (Trial Tr.  126:11-19; Ex. 116.)

67.     Under the terms of the New Grain Handlers Agreement, the Elevator Operators, including Columbia, were allowed to directly employ ship-side labor without having to contract with a stevedoring company, not required to employ a supercargo/clerk, and entitled to other manpower reductions.  (Trial Tr. 126:20-127:6.)

68.     Sundet negotiated the New Grain Handlers Agreement on behalf of ILWU.  (Trial Tr. 114:14-17.)

IX . Memorandum of Agreement

69.    The parties to the New Grain Handlers Agreement also agreed to a separate Memorandum

of Agreement ("MOA"). (Ex. 116 at 37-38.)

70.    The MOA provides in relevant part as follows:

> The International Longshore and Warehouse Union and its Locals 4, 8, and 19
> (collectively, "the Union"), on behalf of themselves and all of their members, and LD
> Commodities Services, LLC, Columbia Grain, Inc., and United Grain Corporation
> (collectively, "the Employer) (including any parent, subsidiaries or other affiliates .
> . . ) do hereby agree to the following:
>
> In consideration of and as a material condition of the Grain Handlers Agreement
> executed on August 27, 2014 and this Memorandum of Agreement, and as a part of
> settlement and compromise, the Union agrees to waive, release and discharge the
> Employer, collectively and each company individually, from any and all claims,
> including any court claims, administrative claims, unfair labor practice charges, or
> labor relations related claims, whether known or unknown, asserted or unasserted,
> which have arisen before the effective date of this Agreement."
>
> Further, the Union agrees to file a motion/request for dismissal of any pending claims
> or charges with prejudice and without any damages, award, remedy, attorney fees or
> costs of any kind or nature to any party within ten (10) calendar days.

(Ex. 116 at 37.)

71.    Sundet executed the MOA on behalf of the ILWU while local representatives executed the

MOA on behalf of Locals 4, 8, and 19.  (Ex. 116 at 38.)

72.    Cartmill understood this language, which he indicated was typically agreed to at the end of

negotiations, to mean that "if there were any outstanding claims from either party at the time, those

all went away."  (Trial Tr. 128:16-23.)

X.  Side Letter of Agreement

73.    Columbia, the ILWU, and Local 8, entered into a Side Letter of Agreement specifically

addressing Local 40's filing of this action ("Side Letter").  (Ex. 116 at 39.)

74.    The Side Letter provides:

> ILWU Local 40 has filed a lawsuit against Columbia Grain, seeking to compel Columbia Grain to arbitrate ILWU Local 40's claim under the PCLCD that Columbia Grain must employ a Local 40 supercargo in its ship-loading operations.
>
> Columbia Grain denies that it has any obligation to or relationship with Local 40 whatsoever and it intends to continue to vigorously defend itself against Local 40's claims.
>
> In the unlikely event that Columbia Grain at some point is ordered by a court or an arbitrator to employ a Local 40 supercargo as a result of Local 40's current lawsuit against Columbia Grain, then upon the hiring of a Local 40 supercargo, the ILWU and its Local 8 agree that Shipboard manning levels will be reduced by one (1).

(Ex. 116 at 39.)

75.    Sundet executed the Side Letter on behalf of the ILWU while a local representative executed the Side Letter on behalf of Local 8.  (Ex. 116 at 39.)

76.    The Side Letter was negotiated to protect Columbia from increased manning requirements and retain a level playing field in the event Local 40 was successful in this action, and was prompted by concerns expressed by McEllrath, who was present at the end of the negotiations of the New Grain Handlers Agreement, that the ILWU did not have control over Local 40, which may choose to not honor ILWU's agreement.  (Trial Tr. 130:3-24; 132:23-133:10.)

*Conclusions of Law*

I.  Court's Authority to Address Issues

1.    "It is well settled in both commercial and labor cases that whether parties have agreed to 'submi[t] a particular dispute to arbitration' is typically an ' "issue for judicial determination." ' " *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010)(quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).  "It is similarly well settled that where the dispute

at issue concerns contract formation, the dispute is generally for courts to decide." *Granite Rock*, 561 U.S. at 296.

2.      The question of whether Local 40 is a party to the White Book or otherwise entitled to enforce the grievance procedure set forth in Section 17, including compelling arbitration of the lost-work grievances under the White Book is a question of contract formation to be decided the court.

II.  Local 40's Authority to Compel Arbitration Under White Book

       *A.  As a Party to the White Book*

3.      When a contract contains an arbitration clause, a presumption of arbitrability exists. Accordingly, a grievance will be presumed arbitrable "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of arbitration." *McKinstry Co. v. Sheet Metal Workers' Intl. Ass'n, Local Union #16*, 859 F.2d 1382, 1384 (9th Cir. 1988) (quoting *United Steelworkers v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 582-82 (1960)).

4.      Arbitration "is a contractual right, and may not be invoked by one who is not a party to the agreement and does not otherwise possess the right to compel arbitration." *Lorber Indus. of Cal. v. Los Angeles Printworks Corp.*, 803 F.2d 523, 525 (9th Cir. 1986).

5.      Consequently, where one of the parties seeking arbitration is not a signatory to the underlying agreement, the nonsignatory must establish the parties to the agreement intended it to derive benefits from the agreement as a precondition to the presumption of arbitrability.  "Where such intent can be shown, and where the arbitration clause is susceptible to the interpretation that the nonsignatory has the right to enforce these benefits, then arbitration is proper." *McKinstry*, 859 F.2d at 1384-85.

6.      A trial court should order arbitration only where it is satisfied the parties have agreed to

Page 15 - FINDINGS OF FACT AND CONCLUSIONS OF LAW                    *{SIB}*

submit the underlying dispute to arbitration.  *Granite Rock*, 561 U.S. at 299.

7.    Collective bargaining agreements are not subject to rules governing interpretation of private contracts, but should be considered with regard to the "scope of other related collective bargaining agreements, as well as the practice, usage, and custom pertaining to all such agreements." *Transportation-Communications Emps. Union v. Union Pac. R. Co.*, 385 U.S. 157, 160-61 (1966).

8.    "The overriding federal policy of industrial peace and productivity is best effectuated if collective bargaining agreements are interpreted and enforced in a uniform manner." *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 109 (9th Cir. 1979).

9.    National labor policy vests unions with authority to both create and restrict the rights of those it represents.  *Nat'l Labor Relations Bd. v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967). Union members may disagree with many of the decisions made by the union on their behalf but are bound by them nevertheless.  *Id*.

10.    Where a union local is not identified as a party to a collective bargaining agreement between its international and an employer group, and is also not identified as a party to, or even mentioned in, the grievance procedure set forth therein, the Ninth Circuit has found the "[i]ntention to vest control over grievance procedures in the International union on the one hand and the employers' association on the other seems as clear as language could make it short of explicit statement." *Local 13, Int'l Longshoremen's and Warehousemen's Union v. Pacific Maritime Ass'n*, 441 F.2d 1061, 1064 (9th Cir. 1971).  The Ninth Circuit, which was likely interpreting an older version of the White Book, noted such interpretation "allocates power over grievance procedures in accordance with current notions of the arrangement most conducive to industrial peace."  *Id*.

10.    The parties to the White Book are specifically identified as the PMA and the ILWU.  The

grievance procedures found in Section 17 of the White Book provide the exclusive remedy for disputes arising between the "Union or any person working under this Agreement, or both, on the one hand, and the Association or any employer acting under this Agreement, or both, on the other hand." (Ex. 127 at 60.)  "Clerks' locals" are not identified as a party entitled to utilize the grievance procedures and, in fact, are not mentioned anywhere in Section 17.  Accordingly, the court finds Local 40 was not a party to the grievance procedures found in Section 17; the parties to the White Book did not agree to allow Local 40, or any clerks' locals, to independently enforce the grievance procedures; and Local 40 does not have standing to sue for breach of the White Book or compel arbitration of the lost work grievances under Section 17.

### B.  As Agent of the ILWU

11.    When a local not authorized to enforce the grievance procedure set forth in a collective bargaining agreement participates in the pursuit of a grievance, it does so as the agent of the international union.  *Local 13*, 441 F.2d at 1065.  Accordingly, Local 40 was pursuing the lost-work grievances as the agent of the ILWU.

12.    The Act provides that a labor organization shall be bound by the acts of its agents.  28 U.S.C. § 185(a) (2015).  "[I]n determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."  29 U.S.C. § 185(e).

13.    General rules of agency apply to actions brought under the Act to enforce the grievance procedures in a collective bargaining agreement.  *Teamsters, Chauffeurs, Warehousemen Local/Union 524 v. Billington*, 402 F.2d 510, 513 (9th Cir. 1968); *Laughon v. Int'l Alliance of*

*Theatrical Stage Emps.*, 248 F.3d 931, 935 (9th Cir. 2001)(common law agency principles govern the relationship between an international and one of its locals). Both Oregon courts and this court look to the Restatement of Agency to determine the contours of agency law. *Int'l Longshore and Warehouse Union v. ICTSI Oregon, Inc.*, 15 F. Supp. 3d 1075, 1098-99 (D. Or. 2014).

14.    A principal may revoke the authority of an agent to act on its behalf by a manifestation of such intent to the agent. Restatement (Third) of Agency § 3.10 (2005). Such revocation may terminate all, or only a portion, of the agent's authority. *Id*. at § 3.10 cmt. b. Intent is manifested through written or spoken word. *Id*. at § 1.03. The revocation becomes effective when the agent has notice of it. *Id*. at § 3.10(1). The agent has notice of a revocation when it knows of the revocation, has reason to know of the revocation, has received effective notice of the revocation, or should know of the revocation. *Id*. at § 1.04(4)

15.    ILWU waived, released, and discharged the Elevator Operators, including Columbia, from "any and all claims, including court claims . . . which have arisen before the effective date of this Agreement" in the MOA. This action, filed by Local 40 as the agent of ILWU on March 26, 2013, arose before the effective date of the MOA. By executing the MOA, the ILWU revoked any authority previously held by Local 40 as the ILWU's agent to pursue the lost-work grievances under the White Book. Local 40 knew, or should have known, of the MOA in the fall of 2014. Local 40 no longer has the authority to compel arbitration of the lost-work grievances as ILWU's agent.

        *C.  As Third-Party Beneficiary of the White Book*

16.    The International executed the White Book "on behalf of itself and each and all of its longshore locals in California, Oregon and Washington . . . " which includes Local 40. Local 40 claims to be a third-party beneficiary of the White Book and, therefore, entitled to enforce the terms

of the White Book.

17.     However, the rights of a third-party beneficiary are limited by the express terms of the underlying contract. *Punikaia v. Clark*, 720 F.2d 564, 570 (9th Cir. 1983). "[T]hird-parties cannot exercise rights that the parties did not intend them to have." *Lucas v. Bechtel Corp.*, 800 F.2d 839, 848 (9th Cir. 1968) quoting *Punikaia*, 720 F.2d at 570.

18.     Assuming, without deciding, Local 40 was a third-party beneficiary to the White Book, the parties to the White Book specified the grievance procedures "provide the exclusive remedy with respect to any disputes arising between the Union or any person working under this Agreement or both, on the one hand, and the Association or any employer acting under this Agreement or both, on the other hand . . . ."   The power to initiate and pursue grievances was expressly reserved to the ILWU, the PMA, and the employees and employers working under the White Book.  Clerks' locals, such as Local 40, were not given the right to pursue grievances and, in fact, were not even mentioned in Section 17 of the White Book.  The parties to the White Book clearly did not intend to provide Local 40 the right to enforce the grievance procedures found in Section 17.  Accordingly, Local 40 does not have an enforceable right as a third–party beneficiary to compel arbitration of the lost-work grievances under the White Book.

III.  Settlement of Lost-Work Grievances by ILWU

19.     A union which has discretion to supervise grievance procedures and invoke arbitration has the authority to settle grievances initiated by its members. *Vaca v. Sipes*, 386 U.S. 171, 191-92 (1967).  Such settlements shall be binding on the members absent proof the union acted in bad faith and breached its duty of good faith and fair dealing. *Id*.

20.     The ILWU, acting on behalf of all of its members, including Local 40, entered into the MOA

and waived, released, and discharged the Elevator Operators, including Columbia, from "any and all claims, including court claims . . . which have arisen before the effective date of this Agreement." By executing the MOA, the ILWU unambiguously settled and released Columbia from any and all claims asserted against it by its members, including Local 40. Therefore, even assuming Local 40 had the right to compel arbitration of the lost-work grievances, ILWU settled those grievances by signing the MOA on behalf of its members. While Local 40 may disagree with this decision, it is still bound by it. *See Allis-Chalmers Mfg. Co.*, 388 U.S. at 180 (union members may disagree with the decisions made by the union on their behalf but are bound by them nevertheless).

21.    Local 40's argument the inconsistencies between the MOA and Side Letter prevent the MOA from being construed as a waiver of this action is not well taken. While the Side Letter was executed at the same time as the MOA, neither agreement references or incorporates the other and can, therefore, be viewed independently. The Side Agreement was negotiated in response to concerns voiced by McEllrath that ILWU would not be able to control Local 40 and to ensure Columbia would remain on a level playing field with other elevator operators should Local 40 not comply with the MOA by dismissing this action. The Side Letter becomes effective only in the "unlikely" event Local 40 is successful in a lawsuit such as the current one, and Columbia is required by a court or arbitrator to employ a Local 40 supercargo/clerk. This language is indicative of ILWU's concern Local 40 would continue to pursue this action despite ILWU's waiver of all outstanding claims against Columbia which is consistent with, not contrary to, the construction of the MOA as a waiver of all outstanding ILWU claims, including Local 40's action to compel arbitration of the lost-work grievances.

*Conclusion*

Local 40 lacks the authority to compel arbitration of the lost-work grievances under the White Book and the ILWU  released Columbia from the claims asserted in this action.  Columbia is entitled to a judgment dismissing this action with prejudice.

DATED this 2nd day of July, 2015.


_____
/s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge